# Exhibit CCC

UNITED STATES DISTRICT COURT

FOR THE

CENTRAL DISTRICT OF CALIFORNIA


TEMPO SECURED MUSIC RIGHTS      )
COLLATERAL, LLC,                )
                                )
                                )
                  PLAINTIFF,    )
                                )
                                )
vs.                             )CASE NO.
                                )2:24-CV-07910-MRA-BFM
                                )
                                )
MILEY CYRUS, ETC., ET AL.       )
                                )
                                )
                                )
                  DEFENDANTS.   )
_____)




ZOOM VIDEOTAPED DEPOSITION OF

EXPERT STEVEN WINOGRADSKY

THURSDAY, JANUARY 8, 2026






JOB NO:  77984709

REPORTER: JESSICA N. NAVARRO, C.S.R. NO. 13512


Page 1

ZOOM VIDEOTAPED DEPOSITION OF EXPERT STEVEN WINOGRADSKY TAKEN ON BEHALF OF DEFENDANTS AT 10:07 A.M., ON THURSDAY, JANUARY 8, 2026, IN VANCOUVER, WASHINGTON, BEFORE JESSICA N. NAVARRO, C.S.R. NO. 13512, PURSUANT TO NOTICE.

APPEARANCES OF COUNSEL

FOR PLAINTIFF:

    WILLKIE FARR &  GALLAGHER, LLP

    BY AMY STERN, ATTORNEY AT LAW

      MICHELLE DUARTE, ATTORNEY AT LAW

    2029 CENTURY PARK EAST

    LOS ANGELES, CALIFORNIA

    310.855.3181

    ASTERN@WILLKIE.COM

FOR DEFENDANTS:

    DAVIS WRIGHT TREMAINE, LLP

    BY PETER ANDERSON, ATTORNEY AT LAW

    350 SOUTH GRAND AVENUE, FLOOR 27

    LOS ANGELES, CALIFORNIA 90071

    213.633.6800

    PANDERSON@DWT.COM

ALSO PRESENT:

    PETER YAROSCHUK, VIDEOGRAPHER

Q    Your work personally.    11:13

A    I would say maybe ten percent.

Q    What did you do -- what were your primary responsibilities day to day at Winogradsky/Sobel?

A    Primarily negotiating composer agreements    11:13 on behalf of our clients, for either as composers or production company clients and overseeing the music clearance process.

My business partner Ron Sobel ran the creative department in terms of scouting writers,    11:13 signing writers.

Q    Did you assist with selection of music for productions during this time?

A    Yes.

Q    And what were the -- can you describe    11:14 further, other than the pitch -- than pitch work, what that involved?

A    It was, you know, basically similar things.  I mean, for a period of time -- I'd have to go back and look at the actual dates on this.  But    11:14 for the initial couple seasons of "American Idol" I was a consultant with Fremantle to help them select what songs would go on the show.  Again, this all kind of jumbles together because my duties at the Winogradsky Company and Winogradsky/Sobel were    11:14

Page 46

similar, so forgive me if I'm having trouble putting    11:14
a distinct timeline on these things.

Q    For --

A    I'm sorry, go ahead.

Q    No, please finish your answer.    11:14

A    So, again, it was very similar process
about understanding what the music needs were for
the production and trying to find songs that were
meeting those needs.

Q    For "American Idol" specifically what was    11:15
your involvement in the song selection process?

A    One of the things about "American Idol"
that a lot people don't realize is that the
contestants are given a list of songs to choose from
because the producers of "Idol" need to make sure --    11:15
and this applies to the other creative shows, the
other competition shows as well -- need to make sure
that whatever song is chosen can be cleared on terms
that are acceptable to the production company.

So in the early days of "Idol" I was    11:15
involved in formulating the licensing terms and
consulting with various publishers to see if those
licensing terms would be available for licensing
songs from their catalogs.  And without getting into
specific publishing companies, just as a general    11:16

Page 47

rule, some songs were available, some songs were not    11:16
based upon the licensing parameters.

For example, in the early days of "Idol" The Beatles, people who owned The Beatles publishing company wouldn't license to "Idol" because they    11:16
didn't like the licensing terms.  Eventually they realized what "Idol" had become and started devoting entire episodes of "Idol" to Beatles music.

So, again, it's a matter of what works from a business standpoint and then bringing in the    11:16
creative aspect that fit those parameters.

Q    Did -- how did that list of songs that were available to the contestants, what was -- well, let me rephrase the question.

What was the process of -- I know you just    11:17
described a piece of the process, which is making sure that the songs were available.  Other than that, what was the process of coming up with the songs that would be offered to contestants?

A    Usually the staff at "Idol" and myself    11:17
would look at catalogs of various companies that we felt we could do business with and pick specific songs that fit both creative criteria and business criteria.

For example, I mentioned earlier I still    11:17

Page 48

do some work for a publishing client.  On basically an annual basis I get a request from the "American Idol" people saying we're interested in one of your client's songs, is it available, can you agree to these licensing terms?  And if we say yes, then it's put on the list and sometimes it actually makes it into the program.  So that's just kind of the shorthand version of how that process worked.

Q    In terms of the actual creative, the kinds of songs that are being chosen who is primarily responsible for that?

A    That would be the supervisor at "Idol." There have been a number of music supervisors over the years.  I think "Idol" is in it's -- over it's 20th, maybe it's 20th year, 21st year.  There have been several music supervisors over that time.

Q    Is it the -- it's the music supervisor who was identifying a type of song that they want to use or how -- how are they narrowing the list for you I should say?

MR. ANDERSON:  Could I ask for clarification?  Are you talking at the beginning when he was involved or are you talking about, you know, as someone offering separately?

Page 49

BY MS. STERN:                                          11:19

     Q    So in -- so on the "American Idol" side,

so I know you've -- you have worked directly with

the publishers and received request; is that right?

     A    On behalf of my publishing clients, yes.    11:19

     Q    But back to your work for "American idol."

"American Idol" was a client of yours; right?

     A    Yes.

     Q    And so when you were trying to obtain

licenses on behalf of "American Idol," and you were  11:19

tasked with certain responsibilities in terms of

making sure what was available and coming up with

the terms, how was the -- was there a type of music

that was identified for you or how did you -- in the

entire universe of songs, how were you identifying   11:20

what you would be looking at in terms of the options

to offer contestants?

     A    From my prospective, part of it was first

finding out what publishers would agree to the

licensing terms that "Idol" was offering.  And that  11:20

those licensing terms started to be a two line

letter to now a three page letter in terms of all

the rights required.  So it was a process that

evolved over time.

          But when I was involved, it was relatively  11:20

Page 50

simple.  Because of the nature of the program, the     11:20

production company would offer fees on a most

favored nation's basis rather than do one on one

negotiations for fees, as is typically done in

many -- most TV and film projects.  But all the --     11:21

and, again, I'll call them the competition programs

like "Idol" or "America's Got Talent" are all done

on a favored nation's basis so that everyone gets

treated equally.

         But we would go to the -- to a variety of     11:21

publishers, both the majors and the independents,

here's what we're proposing, are these terms

generally acceptable to you and are there specific

songs in your catalog that would not be amenable to

these licensing terms.  And once we were able we     11:21

widdle those songs out, we could make creative

decisions based upon the songs that would have been

acceptable under the licensing terms.

         And obviously, you look at who your

contestants might be and try to -- to tier songs     11:22

that vocase their vocal abilities.  So that means

you wouldn't, you know, you would stay away from

heavy metal songs, you would stay away from rap

songs because that's not the type of things that

showcase a vocalist's ability.  So it's the     11:22

Page 51

knowledge of that type of music that would assist in    11:22

the creative process.

    Q    How many songs are we talking about in
terms of what, you know, contestants are being
provided to choose from?                                11:22

    A    I can't speak to current practices because
I haven't worked with them for a while.  But in the
early days it was probably a list of four to 500
songs.

    Q    Okay.  And were you directly involved       11:23
in -- so you had mentioned specifically looking at
songs that showcase vocalist's ability; right?

    A    Yes.

    Q    Were you directly involved in determining
what songs those were?                                  11:23

    A    Not on an individual vocalist basis, but
just in general what songs would highlight, you
know, a vocalist's ability to perform on the show
since when we were clearing the music, we didn't
know who the contestants would be.                      11:23

    Q    What is -- when you're determining what
showcases a vocalist's ability, what is that based
on for you?

    A    Basically based upon my own musical
knowledge.  You know, I was a musician, I was a         11:24

Page 52

singer, I taught music publishing and copyright.    11:24

You know, as a musician and singer I have what's --

you know, I like to think I have what's known in the

business as good ears in terms of trying to figure

out what songs might be better or worse for vocalist    11:24

in general.

And, of course, every specific vocalist

has their own criteria, which is why we would clear

four to 500 songs, knowing that most of them would

not be used, so that the vocalist had a chance to    11:24

pick the song that they felt best suited their own

performances.

Q    So I know, at least based on "Miami Vice,"

you would say you have been responsible for

choosing -- you have been personally responsible for    11:25

choosing a song that was licensed for a TV episode;

is that right?

A    Yes.

Q    Have you ever made the ultimate decision

in terms of what would be licensed for a morning    11:25

show?

A    I don't think I've ever worked on any of

the morning shows.

Q    Have you ever made the ultimate decision

on what would be licensed -- have you ever made the    11:25

Page 53

STATE OF CALIFORNIA      )

COUNTY OF LOS ANGELES   )  ss.

            I, JESSICA N. NAVARRO, C.S.R. NO. 13512, in and for the State of California, do hereby certify:

            That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

            That said deposition was taken down by me in the shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

            That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not required.

            I further certify I am not interested in the event of the action.

            Witness my hand this 22nd day of January, 2026.

                        CERTIFIED SHORTHAND REPORTER

                        FOR THE STATE OF CALIFORNIA

Page 129